UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM ENGEL, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>EDWARD B. CLOUES II, JAMES L. GARDNER, ROBERT J. HALL, THOMAS W. HOFMANN, E. BARTOW JONES, MARSHA R. PERELMAN, WILLIAM H. SHEA, JR., JOHN C. VAN RODEN, JR., ANDREW W. WARD, JONATHAN B. WELLER, PVR PARTNERS, L.P., PVR GP, LLC, REGENCY ENERGY PARTNERS LP, REGENCY GP LP and RVP LLC,<br><br>     Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTIES AND BREACH OF CONTRACTUAL DUTIES**

Plaintiff William Engel ("Plaintiff"), by and through the undersigned counsel, individually and on behalf of all other similarly situated unitholders of PVR Partners, L.P. ("PVR Partners" or the "Partnership"), brings the following Complaint for Violations of Federal Securities Laws, Breach of Fiduciary Duties, and Breach of Contractual Duties against PVR Partners; the Board (defined below) of PVR GP ("PVR GP"), also known as the Individual Defendants (defined below); Regency Energy Partners LP ("Regency"); Regency's wholly-owned subsidiary, RVP LLC ("RVP") and Regency's general partner, Regency GP LP ("Regency GP"). Plaintiff makes the following allegations upon knowledge as to Plaintiff and upon information and belief (including the investigation of counsel and review of publicly available information) as to all other matters, and alleges as follows:

## SUMMARY OF THE ACTION

1.      This is a unitholder class action brought on behalf of the holders of PVR Partners common units against PVR Partners, PVR GP, the Individual Defendants, Regency, Regency GP and RVP for violations of state and federal law, breaches of fiduciary duty, and/or breaches of express and implied contractual duties, and/or aiding and abetting thereof, arising out of defendants' attempt to consummate the proposed acquisition of PVR Partners by Regency (the "Proposed Acquisition") pursuant to an unfair process and for an unfair price.

2.      This matter arises out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, the Board's breaches of their fiduciary duties owed to the Partnership's unitholders under state law, and the Board's breaches of their express and implied contractual duties owed to the Partnership's unitholders under state law.

3.      PVR Partners is a publicly traded master limited partnership ("MLP") focused on owning and operating a network of natural gas midstream pipelines and processing plants asserts,

and owning and managing coal and natural resource properties. The Partnership's midstream assets, located principally in Texas, Oklahoma, and Pennsylvania, provide gathering, transportation, compression, processing, dehydration and related services to natural gas producers. Its coal and natural resource properties, located in the Appalachian, Illinois, and San Juan basins, are leased to experienced operators in exchange for royalty payments.

4.      The relationship between the PVR GP Board and PVR Partners' unitholders, such as Plaintiff, is governed, *in part*, by the Fifth Amended and Restated Agreement of Limited Partnership of Penn Virginia Resource Partners, L.P., dated May 17, 2012, and Amendment No. 1 thereto, dated August 16, 2012 (the "LPA").

5.      Regency is also a publicly traded MLP. Regency is engaged in the gathering and processing, contract compression, treating and transportation of natural gas and the transportation, fractionation and storage of natural gas liquids.

6.      On October 9, 2013, PVR Partners and Regency announced that they had entered into a definitive agreement (the "Merger Agreement") whereby Regency would acquire all of PVR Partners' outstanding units. Each PVR Partners common unit, Class B unit and Special Unit held by a PVR Partners unitholder will receive a one-time cash payment valued at approximately $40 million in the aggregate, as well as 1.02 Regency units. Upon completion of the transaction, PVR Partners will merge with and into Regency, with Regency surviving as the merged entity. The consideration to be received by PVR Partners' unitholders is valued at $28.68 per common unit based on Regency's closing price as of October 9, 2013, and the Proposed Acquisition is valued at approximately $5.6 billion.

7.      On November 8, 2013, defendants caused a Registration Statement on Form S-4 (the "S-4") to be filed with the SEC and disseminated in connection with the upcoming unitholder vote.

The S-4 contains a number of false and misleading statements that are material to unitholders who are expected to rely upon the S-4 to determine whether to approve the Proposed Acquisition. The S-4 further omits a number of material facts necessary to make statements made therein not false and misleading, including the events leading to the Merger Agreement and the analyses conducted by the Board's financial advisors.

8.     The S-4 omissions and misrepresentations are not the only violations by defendants of the duties they owe to unitholders in connection with the Proposed Acquisition. The Proposed Acquisition also substantially undervalues the Company. By agreeing to the exchange ratio of 1.02 Regency units for each PVR Partners unit, the Board significantly undervalued the Partnership based upon PVR Partners' management's Case 1 Projections (defined below), which, according to Evercore's (defined below) Discounted Cash Flow Analysis for PVR Partners, indicate a standalone value of PVR Partners at a range of $29.08 to $37.82 per unit – a range whose lowest value is *higher* than the consideration per unit to be received from the Proposed Acquisition (which is inflated by the additional $40 million aggregate payment). As such, the Board breached their fiduciary duties by agreeing to consideration for the Proposed Acquisition, which considerably undervalues the Partnership.

9.     Pursuant to the Merger Agreement, the consummation of the Proposed Acquisition will cause all unvested stock awards held by PVR Partners' management and by the Board to automatically vest – including all phantom and restricted units. Likewise, if the Proposed Acquisition is consummated, certain members of PVR Partners' management are expected to continue in leadership roles at the combined company.

10.     Additionally, as part of the Merger Agreement, the Board subjected the Partnership's unitholders to a raft of preclusive deal protections, including: (i) a "no-solicitation" clause in Section

5.3(a) of the Merger Agreement that precludes the Partnership from soliciting potential competing bidders and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit, or have submitted, unsolicited alternative proposals; (ii) an "information rights" provision in Section 5.3(c) that mandates the Partnership to advise Regency within twenty-four hours of any proposals or inquiries received from other parties, as well as the identities of those parties and the terms and conditions of the proposals; (iii) a "matching rights" provision in Section 5.3(d) that allows Regency to match any competing proposal within five days of the submission of the superior proposal; and (iv) a "termination fee" provision in Section 7.3 that requires the Partnership to pay Regency $134.5 million (3.5% of the Proposed Acquisition's value) if the Proposed Acquisition is terminated in favor of a superior proposal (together, the "Deal Protections"). The Deal Protections substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

11.     Finally, defendants' entry into the Merger Agreement violated the Board's express and implied contractual duties under the LPA.  For example, before entering into discussions with Regency, both PVR Partners and Regency had pre-existing investment banking relationships with one of PVR Partners' financial advisors, Citi (defined below).  Furthermore, in 2012 and 2013, PVR Partners' other financial advisor, Evercore, served as Regency GP's financial advisor with respect to Regency's acquisition of Southern Union Gas Services, which was announced in February 2013.  Moreover, in 2012, Regency engaged Evercore to provide financial advisory services.

12.     Under the LPA, the existence of conflicts of interest require resolution, as described in Section 7.9(a), in order to satisfy the Board's duty to act in good faith on behalf of the Partnership in approving the Proposed Acquisition.  Because the Board failed to resolve conflicts by constituting

a conflicts committee and obtaining "special approval"[1] of the Proposed Acquisition, the Board breached the LPA by entering into the Proposed Acquisition in bad faith. The Board also violated the implied covenant of good faith and fair dealing by approving the Proposed Acquisition.

13.     Section 2.1 of the LPA states that "Except as expressly provided to the contrary in this Agreement, the rights, duties (including fiduciary duties), liabilities and obligations of the Partners and the administration, dissolution and termination of the Partnership shall be governed by the Delaware Act." The "Delaware Act" is clarified in Section 1.1 to mean the "Delaware Revised Uniform Limited Partnership Act, 6 Del C. Section 17-101, *et seq.*, as amended, supplemented or restated from time to time, and any successor to such statute." The LPA does not expressly limit the fiduciary obligations of the Board in connection with its approval of any merger or change in control.

14.     Under the Delaware Act, limited partnership agreements, including the LPA, cannot eliminate the implied covenant of good faith and fair dealing. *See Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 409 (Del. 2013).

15.     In pursuing the unlawful plan to sell the Partnership for less than fair value and pursuant to an unfair process, defendants have violated federal law, breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, breached their express and implied duties under the LPA, and/or have aided and abetted such breaches. Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm to the Partnership's unitholders. Plaintiff seeks equitable relief only to enjoin the Proposed Acquisition or, alternatively, rescind the Proposed Acquisition in the event it is consummated.

---

[1]   Special Approval is defined in Section 1.1 of the LPA as "approval by a majority of the members of the Conflicts Committee."

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

17.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this judicial district, or is an individual who has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper within this judicial district pursuant to 28 U.S.C. §1391(b), (c) and (d).  Numerous defendants maintain their offices, have agents, transact business and are found within this judicial district.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein arose in part within this judicial district, including the negotiations leading up to the execution of the Merger Agreement.  Finally, defendants inhabit and/or may be found in this judicial district and the interstate trade and commerce described herein are and have been carried out in part within this judicial district.

## PARTIES

19.     Plaintiff William Engel is, and at all times relevant hereto was, a unitholder of PVR Partners.

20.     Defendant PVR Partners is a Delaware MLP with headquarters in Radnor, Pennsylvania.  PVR Partners owns and operates a network of natural gas pipelines and processing plants relating to natural gas producers.  PVR Partners common units are traded on the New York Stock Exchange under the ticker symbol "PVR."

21.     Defendant PVR GP is a Delaware limited liability company with headquarters in Radnor, Pennsylvania.  PVR GP is the general partner of PVR Partners.

22.     Defendant Edward B. Cloues II ("Cloues") has served as a director of PVR GP since January 2003 and has served as Chairman of the Board since July 2011.

23.     Defendant James L. Gardner ("Gardner") has served as a director of PVR GP since January 2006.

24.     Defendant Robert J. Hall ("Hall") has served as a director of PVR GP since March 2011.

25.     Defendant Thomas W. Hofmann ("Hofmann") has served as a director of PVR GP since May 2009.

26.     Defendant E. Bartow Jones ("Jones") has served as a director of PVR GP since May 2012.

27.     Defendant Marsha R. Perelman ("Perelman") has served as a director of PVR GP since May 2005.

28.     Defendant William H. Shea, Jr. ("Shea") has served as a director and Chief Executive Officer ("CEO") of PVR Partners' general partner, PVR GP, since March 2010, and has served as President of PVR GP since June 2012.

29.     Defendant John C. van Roden, Jr. ("van Roden") has served as a director of PVR GP since March 2011.

30.     Defendant Andrew W. Ward ("Ward") has served as a director of PVR GP since May 2012.

31.     Defendant Jonathan B. Weller ("Weller") has served as a director of PVR GP since March 2011.

32.     Defendants Cloues, Gardner, Hall, Hofmann, Jones, Perelman, Shea, van Roden, Ward and Weller are referred to collectively as the "Individual Defendants" and/or the "Board."

33.     Defendant Regency is a Delaware corporation and maintains its principal executive offices at 2001 Bryan Street, Suite 3700, Dallas, Texas 75201.

34.     Defendant Regency GP is a Delaware limited partnership and the general partner of Regency.

35.     Defendant RVP is a Delaware limited liability company and a wholly owned subsidiary of Regency.

## DEFENDANTS' FIDUCIARY DUTIES

36.     Under applicable law, in any situation where the directors of PVR Partners undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a breakup of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the Partnership's unitholders, and if such transaction will result in a change of control, the unitholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the Partnership's unitholders;

(b)     will discourage or inhibit alternative offers to purchase control of the Partnership or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the Partnership's unitholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public unitholders.

- 8 -

37.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of PVR Partners, are obligated under Delaware law to refrain from:

(a)    participating in any transaction where the directors' or officers' loyalties are divided;

(b)    participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public unitholders of the corporation; and/or

(c)    unjustly enriching themselves at the expense or to the detriment of the public unitholders.

38.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiff and other public unitholders of PVR Partners. Defendants are choosing not to provide unitholders with all the information necessary to make an informed decision in connection with the Proposed Acquisition. As a result, neither Plaintiff nor the Class will receive adequate or fair value for their PVR Partners units in the Proposed Acquisition.

39.    In addition, when resolving any potential or actual conflict of interest, Section 7.9 of the LPA requires PVR GP and the Board to act in a manner that is "fair and reasonable to the Partnership." Moreover, Section 3.4 of the LPA provides that all unitholders are entitled "to obtain true and full information regarding the status of the business and financial condition of the Partnership" and "to obtain such other information regarding the affairs of the Partnership as is just and reasonable."

40.     Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith and independence in connection with the Proposed Acquisition, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon the Individual Defendants as a matter of law.

## THE PROPOSED ACQUISITION

41.     On October 9, 2013, PVR Partners and Regency entered into the Merger Agreement, which detailed the terms of the Proposed Acquisition.  Specifically, Regency agreed to acquire PVR Partners in a unit-for-unit transaction plus a one-time cash payment to PVR Partners' unitholders, with a total valuation of approximately $5.6 billion (including the assumption of net debt of $1.8 billion).  The press release announcing the Proposed Acquisition stated, in pertinent part:

> REGENCY ENERGY PARTNERS TO ACQUIRE PVR PARTNERS FOR $5.6 BILLION: Significantly Expands Regency's Gas Gathering and Processing Operations in Key Producing Regions Offers Compelling Strategic Growth Opportunities
>
> DALLAS, TX and RADNOR, PA – October 10, 2013 – Regency Energy Partners LP ("Regency") (NYSE: RGP) and PVR Partners, L.P. ("PVR") (NYSE: PVR) today announced that their respective boards of directors have unanimously approved a definitive merger agreement, pursuant to which Regency will acquire PVR.  This acquisition will be a unit-for-unit transaction plus a one-time cash payment to PVR unitholders that collectively imply a value today for PVR of approximately $5.6 billion, including the assumption of net debt of $1.8 billion.
>
> The transaction, which is expected to close in the first quarter of 2014, will create a leading gas gathering and processing platform with a scaled presence across North America's premier high-growth unconventional oil and gas plays in Appalachia, West Texas, South Texas, the Mid-Continent and North Louisiana. The combination continues to build on Regency's fee-based cash flows. The combination is expected to be slightly dilutive to 2014 DCF, but is not expected to affect anticipated cash distribution growth in 2014; moreover, the enhanced scale, balance sheet strength and diversification are expected to provide substantial EBITDA and DCF growth over time.  Specifically, the acquisition better positions the combined company to capitalize on the long-term growth momentum of North American gas production through incremental, high-value expansions around its core asset base, as well as other growth and acquisition opportunities.

"This acquisition enhances our overall geographic diversity by providing Regency with a strategic presence in two prolific producing areas, the Marcellus and Utica shales in the Appalachian Basin and the Granite Wash in the Mid-Continent region" said Michael J. Bradley, president and chief executive officer of Regency. "These are tremendously complementary businesses, and as a result, we expect the increased footprint and scale to create significant synergies and provide substantial organic growth opportunities that will continue to support our goal of increasing distributions and creating unitholder value."

"We view this transaction as a merger creating a larger, more diversified operating platform that will be highly attractive to investors, customers, creditors and employees," said William H. Shea, Jr., president and chief executive officer of PVR.

"We believe that the size and scope of the combined enterprise will be highly beneficial to our unitholders, offering added diversification and critical mass which will provide the needed financial flexibility to fully execute and benefit from the significant portfolio of organic growth projects we have developed over the past three years, especially in our Eastern midstream operations."

Under the terms of the definitive agreement, holders of PVR common units, Class B Units and Special Units will receive 1.020 common units of Regency for each PVR unit held. In addition, PVR unitholders will receive a one-time cash payment at closing of the merger estimated to be approximately $40 million in the aggregate. The consideration to be received by PVR unitholders is valued at $28.68 per common unit based on Regency's closing price as of October 9, 2013, representing a 25.7% premium to the closing price of PVR's common units of $22.81 on October 9, 2013, and a 24.8% premium to the volume weighted average closing price of PVR's common units for the last 10 trading days ending October 9, 2013.

Following the closing, the name of the combined company will remain Regency with headquarters in Dallas.

**Strategic Rationale**

The addition of PVR's asset base in Appalachia and the Mid-Continent region to Regency's existing footprint in the Permian Basin, South Texas and North Louisiana will create a diversified, high-growth midstream company with assets in many of the most economic, high-growth unconventional oil and gas plays in North America: the Wolfcamp, Bone Springs, Avalon and Cline shale plays in the Permian Basin, the Eagle Ford shale play in South Texas, the Marcellus and Utica shale plays in Appalachia, the Granite Wash play in Oklahoma and Texas and the Haynesville Shale and Cotton Valley formation in North Louisiana.

The increased scale and footprint of the combined company positions Regency to build deeper customer relationships and secure and execute additional accretive growth opportunities, both organically or via bolt-on acquisitions. The combined company will also benefit from the addition of a growing fee-based asset portfolio,

with all the Marcellus and Utica margin coming from fee-based contracts.   In addition, the acquisition provides Regency with an expanded talent base, allowing for more efficient collaboration and sharing of best practices across the business.

**Integration**

Regency and PVR expect to establish a transition team comprised of members of both management teams to prepare for and to oversee the integration of the businesses.

Michael J. Bradley will continue as president and chief executive officer and Thomas E. Long will continue as executive vice president and chief financial officer of the combined company.

**Terms and Conditions**

The transaction is subject to the approval of PVR's unitholders, Hart-Scott-Rodino Antitrust Improvements Act approval and other customary closing conditions.

**Advisors**

BofA Merrill Lynch and UBS Investment Bank acted as financial advisors and Baker Botts L.L.P. acted as legal counsel to Regency. Citigroup Global Markets Inc. and Evercore Partners acted as financial advisors and Vinson & Elkins LLP acted as legal counsel to PVR.

42.      PVR Partners' business consists of the following three segments: (1) Coal; (2) Midcontinent Midstream; and (3) Eastern Midstream.  As of 2012, PVR Partners' Coal business segment represented a majority of PVR Partners' EBITDA.  During 2012, the Board, however, sought to shift PVR Partners' focus to natural gas related assets, particularly in major United States shale basins.

43.      The events that led to the Proposed Acquisition began in late 2012, when PVR Partners entered into discussions with "Company A," which was interested in potentially purchasing PVR Partners' Coal business.  On December 10, 2012, PVR Partners entered into a confidentiality agreement with Company A.  In March 2013, Company A provided PVR Partners with a valuation range (undisclosed in the S-4) that PVR Partners' management (not the Board) concluded was unacceptable.  According to the S-4, the Board was not apprised of Company A's offer until

September 4, 2013, and, after March 2013, PVR Partners had no further interaction with Company A.

44.     Evercore Partners ("Evercore") served as a financial advisor to assist with evaluating unnamed strategic alternatives.  According to the S-4, neither Evercore, nor any other financial advisor, was involved in any of PVR Partners' discussions with Company A, Company B, or Company C.  PVR Partners formally retained Evercore in January 2013.

45.     On June 20, 2013, PVR Partners entered into a confidentiality agreement with "Company C" for purposes of a possible purchase of PVR Partners' Coal business.  In August 2013, Company C provided PVR Partners with an oral valuation range (again, undisclosed in the S-4) that PVR Partners' management (not the Board) concluded was unacceptable.  According to the S-4, the Board was not apprised of Company C's offer until September 4, 2013, and, after August 2013, PVR Partners had no further interaction with Company C.

46.     On July 2, 2013, PVR Partners executed a confidentiality agreement with "Company B," also regarding a potential purchase of PVR Partners' Coal business.  In August 2013, Company B provided PVR Partners with an oral valuation range (also not disclosed in the S-4) that PVR Partners' management (not the Board) concluded was unacceptable.  According to the S-4, the Board was not apprised of Company B's offer until September 4, 2013, and, after August 2013, PVR Partners had no further interaction with Company B.

47.     In mid-July 2013, representatives of another financial advisor to PVR Partners, Citigroup Global Markets Inc. ("Citi"), contacted defendant Shea and Robert B. Wallace ("Wallace"), PVR Partners' Chief Financial Officer ("CFO") to discuss the possibility of a merger between Regency and PVR Partners.  At this time, Citi had pre-existing investment banking

relationships with both Regency and PVR Partners.  PVR Partners asked Citi to arrange a meeting with Regency, which was scheduled for August 22, 2013.

48.     On August 7, 2013, defendant Shea met with executives from another MLP, "Company X," to discuss a potential joint venture between PVR Partners and Company X regarding the natural gas portion of PVR Partners' business.  During this meeting, Company X informed defendant Shea that it was not interested in pursuing a joint venture if PVR Partners retained its Coal business.  On August 30, 2013, PVR Partners and Company X executed a confidentiality agreement that included a standstill.

49.     On August 22, 2013, PVR Partners and Regency met, along with representatives from Citi, to discuss a possible merger.  On August 28, 2013, PVR Partners and Regency executed a confidentiality agreement that included a standstill.

50.     On September 9, 2013, PVR Partners and representatives of Citi met with Regency and its legal and financial advisors to discuss a possible merger.  During this meeting, PVR Partners provided Regency with PVR Partners management's financial projections for PVR Partners for the next five years (the "Case 1 Projections"), which projected PVR Partners' 2014 adjusted EBITDA to be $442 million and 2015 adjusted EBITDA to be $574 million, and assumed that all of PVR Partners' growth projects would be completed on time and on budget.  Regency committed to orally provide PVR Partners with an indication of its valuation of PVR Partners on or about September 16, 2013.

51.     PVR Partners' management also prepared a second set of financial projections that, unlike the Case 1 Projections, assumed that not all of PVR Partners' growth projects would be on time and on budget, and projected PVR Partners' 2014 adjusted EBITDA to be $388 million and 2015 adjusted EBITDA to be $473 million (the "Case 2 Projections").

52.     In the meantime, on September 10, 2013, PVR Partners spoke with Company X to discuss a possible merger.  Company X informed PVR Partners at this time that it was not interested in a merger so long as PVR Partners owned its Coal business.

53.     On September 13, 2013, the confidentiality agreement between Regency and PVR Partners was amended to permit Regency to share PVR Partners' confidential information with Regency's financial advisors and an independent petroleum engineering consultant.

54.     On September 17, 2013, Regency provided Defendant Shea with a proposed exchange ratio of 1.02 to 1.06 units of Regency for each unit of PVR Partners.  Defendant Shea informed Regency that the offer needed to be discussed with the Board and PVR Partners' financial advisors.

55.     On September 24, 2013, PVR Partners clarified with Evercore and Citi that each would serve as a financial advisor to PVR Partners for purposes of the Proposed Acquisition. Pursuant to an engagement letter, Evercore agreed to render a fairness opinion for which it would be paid a flat fee not contingent upon the Proposed Acquisition closing.  Pursuant to a separate engagement letter, Citi and PVR Partners agreed to a $1 million fee upon announcement of a transaction with Regency and a $12 million fee for the consummation of such transaction, but did not request that Citi render a fairness opinion.

56.     Also on this date, the Board met to consider Regency's offer and to discuss defendant Shea's communications with Company X. At this meeting, Citi presented the Case 2 Projections to the Board.  The Board also discussed potential synergies that PVR Partners' management anticipated would result from a transaction with Regency. The Board authorized defendant Shea to present the following counterproposal to Regency: (i) an exchange ratio of 1.08 to 1.12; (ii) a payment to PVR Partners' unitholders, either upfront or by raising Regency's distribution, to account for the

difference between PVR Partners' quarterly distribution and Regency's quarterly distribution; and (iii) a reduction in Regency GP's incentive distribution rights ("IDRs"),[2] which would enhance the value of the Regency units that PVR Partners' unitholders would receive in such a transaction. defendant Shea subsequently communicated this counterproposal to Regency.

57.     On September 26, 2013, defendant Shea engaged in a teleconference with Regency whereupon Regency stated that it was prepared to discuss a range of exchange ratios of between 1.06 and 1.07 Regency units for each PVR Partners units, but that it was unable to agree to a specific distribution increase and that it had not discussed with Regency GP a reduction of its IDRs. defendant Shea informed Regency that he would confer with PVR Partners' management (but not the Board) and get back to Regency.

58.     On September 27, 2013, PVR Partners and Citi met with Company X, and PVR Partners provided Company X with a presentation, including the Case 1 Projections.   At the conclusion of the meeting, Defendant Shea requested that Company X provide PVR Partners with a preliminary indication of exchange ratios by October 1, 2013.

59.     On October 1, 2013, PVR Partners and Regency met for the purpose of enabling Regency to complete its due diligence review.

60.     On that same day, Company X contacted defendant Shea to inform him that it was not prepared to offer PVR Partners any premium above PVR Partners' current unit price.  Defendant Shea communicated Company X's position to the Board at the next Board meeting.

---

[2]     IDRs entitle the general partner of an MLP to an increasing percentage of the incremental cash flow distributed by the partnership as the amount distributed to the limited partner increases.  IDRs are designed to incentivize the general partner to raise quarterly cash distributions to unitholders.

61.     On October 2, 2013, PVR Partners and Regency met to discuss a draft merger agreement and to table discussion of Regency's September 26 offer until after the October 3, 2013 Board and Regency board of directors meetings.

62.     On October 3, 2013, Regency contacted defendant Shea and informed him that, having largely completed due diligence, Regency was prepared to acquire PVR Partners on the following terms: (i) an exchange ratio of 1.02 Regency units for each PVR Partners' units; (ii) no cash to cover the difference between the partnerships' distributions; and (iii) no financial support from Regency GP.

63.     Followed continued negotiations between the parties, Regency revised its offer to acquire PVR Partners to the following terms: (i) an exchange ratio of 1.02 Regency units for each PVR Partners unit; (ii) a cash payment to PVR Partners' unitholders in an amount equal to the difference between $2.20 per unit and the annualized amount of the Regency distribution for the quarter immediately prior to the closing, as adjusted by the exchange ratio; (iii) no support from Regency GP; and (iv) no Regency board seats for any member of the Board.

64.     On October 9, 2013, the Board met and received a presentation of the Evercore Fairness Opinion (defined below).  Subsequently, the Board determined that it was in the best interests of PVR Partners and its unitholders to enter into the Proposed Acquisition and approved the Merger Agreement.

65.     The S-4 contains the following information concerning Evercore's relationship with Regency from Evercore's fairness opinion to the Board, dated October 9, 2013 (the "Evercore Fairness Opinion"):

> In 2012 and 2013, *Evercore provided financial advisory services to Regency GP with respect to the acquisition of the ownership interests in Southern Union Gas Services* held directly or indirectly by Southern Union Company and Energy Transfer Equity L.P., for which Evercore received a fee and reimbursement of out-

of-pocket expenses, and, in 2012, Evercore was engaged to provide financial advisory services to Regency with respect to matters unrelated to the merger.

[Emphasis added].

66.     As described above, the Merger Agreement includes certain Deal Protections, which unreasonably restrain PVR Partners' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in PVR Partners, including PVR Partners' Coal business.  The Deal Protections operate to prevent an effective "fiduciary out" under the circumstances.

67.     In pursuing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches. Additionally, the Board failed to negotiate a price collar to protect the consideration offered in the form of units from any significant movements in the price of Regency's units prior to the consummation of the Proposed Acquisition.  Moreover, the Deal Protections operate to block any other potential acquirers, rendering unlikely any alternative proposals to acquire PVR Partners. Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's unitholders.  Plaintiff seeks equitable relief to enjoin the Proposed Acquisition or, alternatively, rescind the Proposed Acquisition in the event it is consummated.

## THE FALSE AND MISLEADING S-4

68.     In an attempt to secure unitholder support for the unfair Proposed Acquisition, on November 8, 2013, defendants issued the materially false and misleading S-4.  The S-4, which recommends that PVR Partners unitholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the process leading up to the Merger Agreement, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Partnership's

assets both as a standalone entity and as a merger partner for Regency.  Specifically, the S-4 omits

and/or misrepresents the material information set forth below in contravention of §§14(a) and 20(a)

of the 1934 Act.

**The Events Leading to the Merger Agreement**

69.     The S-4 fails to provide unitholders with material information regarding the events

leading to the Merger Agreement, including, in particular, the following:

(a)     *Whether the Board considered the formation of a conflicts committee and, if*

*so, the reasons for declining to form one.*  As described above, the Board failed to constitute a

conflicts committee and obtain special approval for purposes of approving the Proposed Acquisition.

The S-4, however, fails to state whether the Board even considered forming a conflicts committee,

and, if so, the Board's reasons for declining to form one.  This information is material because

unitholders are entitled to know why the Board did not avail itself of the conflicts resolution

mechanism provided in the LPA, as well as why the Board believed that approval of the Proposed

Acquisition without special approval from a conflicts committee was appropriate under the

circumstances.

(b)     *The individual value ranges indicated by each of Company A, Company B,*

*and Company C for PVR Partners' Coal business and whether the confidentiality agreements*

*entered between PVR Partners and Company A, Company B and Company C included a standstill*

*provision and, if so, whether such provision(s) continue to survive.*  The S-4 states on page 56 that

PVR Partners' management received valuations of PVR Partners' Coal business from Company A,

Company B, and Company C, each of which were rejected by PVR Partners' management as being

unacceptable.  The S-4, however, does not disclose the individual value ranges of each of these

valuations, or whether the Board or its advisors conducted any analysis of these valuations and their

financial impact on the Partnership. This information is material because unitholders are entitled to

know why the Board preferred the Proposed Acquisition over other alternatives, as well as the nature and financial viability of those other alternatives. Unitholders are also entitled to know whether the Board was informed prior to entering into the Proposed Acquisition. This information is likewise material because unitholders are entitled to know why PVR Partners' management made unilateral decisions to reject these valuations and cease discussions with Company A, Company B and Company C.

(c)     *The specific strategic alternatives that Evercore analyzed for PVR Partners in January 2013*. On page 56, the S-4 states that PVR Partners retained Evercore to assist in evaluating strategic alternatives. However, the S-4 does not disclose the specific strategic alternatives analyzed by Evercore. This information is material because unitholders are entitled to know why the Board preferred the Proposed Acquisition over other alternatives, as well as the nature and financial viability of those other alternatives. Unitholders are also entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

(d)     *The valuations that Evercore calculated for each of PVR Partners' business segments – Coal, Midcontinent Midstream, and Eastern Midstream*. The S-4 on page 56 states that Evercore conducted a preliminary valuation of each of PVR Partners' business segments – Coal, Midcontinent Midstream, and Eastern Midstream. However, the S-4 does not state the actual valuations for any of these business segments. The omission of this information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition. Furthermore, the importance of PVR Partners' Coal business segment to PVR Partners' decision to sell the Partnership, and its relevance to PVR Partners' discussions with Company A, B, and C, enhances the materiality of Evercore's valuation of the Coal business segment.

(e)     *The estimated value of the potential synergies*.  The S-4 on page 60 states that the Board discussed potential synergies anticipated by PVR Partners' management to result from the Proposed Acquisition.  The S-4 does not include any information concerning the value of these potential synergies, or the timeframe in which the Board expects these potential synergies to be realized.  The omission of this information renders the S-4 materially misleading because the Board has a duty to secure the best possible price for the Partnership's units, and unitholders are entitled to full and fair disclosure of information sufficient to allow them to properly evaluate the consideration obtained for the Proposed Acquisition.

(f)     *Why defendant Shea believed that the Case 2 Projections were more likely to happen if PVR Partners remained a stand-alone entity but the Case 1 Projections would be more likely in a combination with Regency*.  The S-4 on page 65 discusses that defendant Shea explained to the Board on October 8, 2013, his belief that the Case 2 Projections were more likely to be the actual case going forward absent the Proposed Acquisition.  Defendant Shea further explained that a combined PVR Partners and Regency would be more likely to meet the Case 1 Projections.  The S-4, however, fails to explain the basis for defendant Shea's belief on both points.  The omission of this information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

(g)     *Whether the Board considered the differences between the LPA and Regency's Limited Partnership Agreement*.  Although the S-4 contains a comparison of the rights of Regency unitholders and PVR Partners' unitholders under their respective limited partnership agreements, the S-4 fails to disclose whether, if at all, the Board considered these differences in determining to enter into the Proposed Acquisition.  This information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

(h)     *Whether the Board had any informal discussions with any other companies during 2012 and/or 2013 concerning a potential sale of all or part of PVR Partners' business, including the Coal Business.*  While the S-4 contains a limited recitation of the Board's interactions with Company A, Company B, Company C and Company X concerning a potential sale of all or part of PVR Partners' business, the S-4 fails to explain whether the Board had any informal discussions with any other companies and, if so, what was the nature and extent of any such discussions.  This information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

(i)     *Whether the Board considered any other financial advisors other than Evercore and Citi, and the Board's rationale for retaining Evercore and Citi as financial advisors.*  The S-4 contains a discussion of both Evercore and Citi's relationships with respect to Regency.  The S-4 fails, however, to explain whether the Board considered any other financial advisors other than Evercore and Citi, and the Board's rationale for retaining Evercore and Citi as financial advisors.  This information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

(j)     *Whether the Board considered potential conflicts of interest with its financial advisors.*  The S-4 contains a discussion of PVR Partners' retention of financial advisors.  The S-4, however, fails to explain the Board's consideration of conflicts in connection with its approval of the Proposed Acquisition.  Furthermore, the S-4 fails to explain the prerequisites to constituting a conflicts committee.  This information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition. pre-requisite to constituting a conflicts committee

(k)      *Whether the Board was apprised of Evercore and Citi's pre-existing relationships with Regency, and the Board's rationale for failing to retain another financial advisor other than Evercore and Citi*.  The S-4 contains a discussion of both Evercore and Citi's relationships with respect to Regency.  The S-4 fails, however, to explain whether the Board was apprised of Evercore and Citi's pre-existing relationships with Regency, as well as the Board's rational for failing to retain another financial advisor other than Evercore and Citi. This information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

(l)      *Whether the Board attempted to include a price collar with respect to the consideration offered by Regency*.  The S-4 fails to explain whether the Board ever attempted to negotiate for the inclusion of a price collar with respect to the consideration offered by Regency. This information is material because unitholders are entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

**The Analyses Conducted by Evercore and Citi**

70.     The S-4 fails to disclose material information, including certain data and inputs, supporting the analyses conducted by the financial advisors for PVR Partners (Evercore and Citi), including:

(a)      *The financial projections provided by PVR Partners' management and relied upon by Evercore for purposes of its analysis, for fiscal years 2014-2018, for both the Case 1 and the Case 2 Projections, for the following items: (i) revenue; (ii) EBITDA; (iii) adjusted EBITDA; (iv) depreciation and amortization; (v) operating income; (vi) taxes (or tax rate); (vii) net income; (viii) changes in net working capital; (ix) growth capital expenditures; (x) maintenance capital expenditures; (xi) unlevered free cash flow; (xii) distributable cash flow; and (xiii) distributions*.  The S-4 states that management of PVR Partners provided Evercore with

financial projections.   However, the S-4 fails to disclose certain of those projections to the Partnership's unitholders.  Defendants' failure to disclose this information renders the S-4 false and misleading because PVR Partners' unitholders are entitled to be informed of management's best estimates of the Partnership's future cash flows, especially when the projections form the bases for the analyses offered by the Board's financial advisors and the value assumptions presented to the buyer, Regency.

        (b)      *With respect to the financial projections provided by PVR Partners' management: (i) Evercore's role, if any, with respect to the preparation or creation of the Case 1 and Case 2 Projections, including all assumptions made and the basis for such assumptions; (ii) why PVR Partners' management only prepared projections for 2014 and 2015; (iii) the definition of "distributable cash flow" for purposes of the Case 1 and Case 2 Projections; (iv) the rationale for not including an upside case of financial projections; and (v) whether PVR Partners provided the same Case 1 and Case 2 Projections to the Board, Evercore, Regency, Company A, B, C and X, and any other prospective bidders and strategic partners.*  As explained above, the S-4 states that management of PVR Partners provided Evercore with financial projections.  However, the S-4 fails to disclose certain information concerning these projections to PVR Partners' unitholders. Defendants' failure to disclose this information renders the S-4 false and misleading because PVR Partners' unitholders are entitled to be informed of the facts and information surrounding management's best estimates of the Partnership's future cash flows, especially when the projections form the bases for the analyses offered by the Board's financial advisors and the value assumptions presented to the buyer, Regency.

        (c)      *The financial projections provided by Regency's management and relied upon by Evercore for purposes of its analysis, for fiscal years 2014-2018, for the following items:*

*(i) revenue; (ii) EBITDA; (iii) adjusted EBITDA; (iv) depreciation and amortization; (v) operating income; (vi) taxes (or tax rate); (vii) net income; (viii) changes in net working capital; (ix) growth capital expenditures; (x) maintenance capital expenditures; (xi) unlevered free cash flow; (xii) distributable cash flow; and (xiii) distributions*. The S-4 states that Regency provided Evercore with financial projections. However, the S-4 fails to disclose certain of those projections to the Partnership's unitholders. Defendants' failure to disclose this information renders the S-4 false and misleading because PVR Partners' unitholders are entitled to be informed of the Board's understanding of Regency's best estimates of its future cash flows.

(d)      *With respect to Evercore's Discounted Cash Flow Analysis for PVR Partners: (i) the definition of unlevered free cash flow used by Evercore; (ii) the inputs and assumptions used by Evercore to derive the discount rate range for PVR as a whole (9.0% to 10.0%), Eastern Midstream (9.5% to 10.5%), Midcontinent Midstream (9.5% to 10.%), Coal (10.5% to 11.5%) and PVR Partners' distributions (9.5% to 10.5% and 13.5% to 14.5%); (iii) the basis for selecting perpetuity growth rates for PVR Partners as a whole (2.25% to 2.75%), Eastern Midstream (2.5% to 3.0%), Midcontinent Midstream (0.0% to 1.0%), and Coal (-0.5% to 0.5%); (iv) the separate ranges of value concluded for the terminal multiple approach and the perpetuity growth rate approach for PVR Partners as a whole, Eastern Midstream, Midcontinent Midstream, and Coal, for each of the Case 1 and the Case 2 Projections; (v) the implied terminal EBITDA multiples resulting from each of Evercore's DCF analyses utilizing perpetuity growth rates; and (vi) the implied perpetuity growth rates resulting from each of Evercore's DCF analyses utilizing terminal EBITDA multiples*. The S-4 states on pages 72 to 73 that Evercore performed a discounted cash flow analysis to derive an implied per unit value range for PVR Partners' common units. However, the S-4 fails to provide the inputs listed above. These omissions render the S-4

materially misleading because they have a significant impact on the outcome of the Discounted Cash Flow analysis. Unitholders are entitled to know these inputs so that they can determine if they are appropriate, and if not, select their own to arrive a value of the Partnership. Without disclosure of these inputs into Evercore's Discounted Cash Flow analysis, unitholders cannot determine if the outcome of Evercore's Discounted Cash Flow analysis is an adequate measure of the Partnership's intrinsic value, and thus do not have the information necessary to make a competent decision as to whether to vote in favor of the Proposed Acquisition.

        (e)      ***With respect to Evercore's Precedent M&A Transactions Analysis for PVR Partners: (i) the Transaction Value / EBITDA multiplies observed for each of the precedent transactions selected; (ii) identification of which of the precedent transactions selected by Evercore are most relevant to each of PVR Partners' Eastern Midstream, Midcontinent Midstream, and Coal business segments; and (iii) the individual equity value per unit ranges calculated for each of the multiple ranges selected by Evercore for each of the Eastern Midstream, Midcontinent Midstream and Coal business segments, for each of the Case 1 and the Case 2 Projections.*** The S-4 states that Evercore, in conducting its analysis, selected transactions since February 2010 which it deemed to have characteristics similar to those of PVR Partners, but it does not disclose the individual multiples observed for each of the selected transactions. The omission of this information is material because without the individually observed multiples, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Regency, and thus are unable to assess whether Evercore has adequately compared the proposed transaction to the selected transactions.

        (f)      ***With respect to Evercore's Peer Group Trading Analysis for PVR Partners, the following multiples for each of the comparable companies selected by Evercore: (i) Enterprise***

*Value / 2014E EBITDA; and (ii) Enterprise Value / 2015E EBITDA*.  The S-4 sets forth a summary of Evercore's Peer Group Trading Analysis, but it fails to disclose two key multiples for that analysis.  The Peer Group Trading Analysis is derived by selecting comparable companies and then applying the key multiples for those companies to similar multiples at PVR Partners.  Without these multiples, unitholders are unable to independently assess whether the companies selected by Evercore are comparable to the Partnership (as well whether Evercore made any adjustments before applying the multiples to the Partnership) and its performance.

    (g)  *With respect to Evercore's Peer Group Trading Analysis for PVR Partners, whether Evercore conducted any kind of benchmarking analysis for PVR Partners, in relation to the selected comparable companies*.  This information is material to a unitholder's decision on whether the consideration offered by Regency is fair.  Without this information, unitholders are unable to determine whether Evercore examined the key financial statistics and ratios for PVR Partners and its comparables and, if so, whether Evercore placed a greater (or lesser) value on any of the comparable companies for purposes of its valuation analysis.  This information will allow a unitholder to independently assess whether Evercore improperly adjusted the value of PVR Partners downward.

    (h)  *With respect to Evercore's Premiums Paid Analysis for PVR Partners: (i) the objective criteria used to identify the selected transactions; (ii) the date, target, acquirer, target enterprise value, and premium for each of the selected transactions; and (iii) what weight Evercore gave to this analysis as opposed to the other analyses performed by Evercore*.  This information is material to a unitholder's decision on whether the consideration offered by Regency is fair.  Without this information, unitholders are unable to effectively determine whether the consideration being offered by the Proposed Acquisition provides an adequate premium.  This

information will allow a unitholder to independently assess whether an adequate premium is being offered by the Proposed Acquisition.

(i)     *With respect to Evercore's Discounted Cash Flow Analysis for Regency: (i) the inputs and assumptions used to derive the range of discount rates for Regency's cash flows (8.5% to 9.5%) and for Regency's distributions (9.0% to 10.0% and 13.5% to 14.5%); and (ii) the separate ranges of value concluded for the terminal multiple methodology and the perpetuity growth rate methodology.*  The S-4 states on pages 76 to 77 that Evercore performed a Discounted Cash Flow Analysis to derive an implied per unit value range for Regency common units.  However, the S-4 fails to provide the inputs listed above.  These omissions render the S-4 materially misleading because they have a significant impact on the outcome of the Discounted Cash Flow Analysis.  Unitholders are entitled to know the basis for the selection of these inputs so that they can determine if they are appropriate, and if not, select their own to arrive a value of Regency.  Without disclosure of these inputs into Evercore's Discounted Cash Flow Analysis, unitholders cannot determine if the outcome of Evercore's Discounted Cash Flow Analysis is an appropriate measure of Regency, and thus do not have the information necessary to make a competent decision whether to vote in favor of the Proposed Acquisition.

(j)     *With respect to Evercore's Precedent M&A Transaction Analysis for Regency, the following information for each of the precedent M&A transactions selected by Evercore: (i) the individually observed Transaction Value / EBITDA multiples; and (ii) the individual equity value per unit ranges for each of the selected multiple ranges.*  The S-4 on pages 77 to 79 states that Evercore, in conducting its analysis, selected transactions since February 2010 which it deemed to have characteristics similar to those of Regency, but it does not disclose the individual multiples observed for each of the selected transactions.  The omission of this information

is material because without the individually observed multiples, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Regency, and thus are unable to assess whether Evercore has adequately compared the Partnership's transaction performance to its selected transactions.

(k)      *With respect to Evercore's Peer Group Trading Analysis for Regency, the following multiples for each of the comparable companies selected by Evercore: (i) Enterprise Value / 2014E EBITDA; and (ii) Enterprise Value / 2015E EBITDA.*  The S-4 sets forth a summary of Evercore's Peer Group Trading Analysis, but it fails to disclose two of the key inputs for that analysis.  The omission of the multiples is material because the value implied by the Peer Group Trading Analysis is derived by selecting comparable companies and then applying the key metrics for those companies to similar metrics at Regency.  Without this information, unitholders are unable to independently assess whether the companies selected by Evercore are comparable to Regency (as well whether Evercore made any adjustments before applying the multiples to Regency).

(l)      *With respect to Evercore's Peer Group Trading Analysis for Regency, whether Evercore conducted any kind of benchmarking analysis for Regency, in relation to the selected comparable companies.*  This information is material to a unitholder's decision on whether the consideration offered by Regency is fair.  Without this information, unitholders are unable to determine whether Evercore examined the key financial statistics and ratios for Regency and its comparables and, if so, whether Evercore placed a greater (or lesser) value on any of the comparable companies for purposes of its valuation analysis.  This information will allow a unitholder to independently assess whether Evercore improperly adjusted the value of Regency upward.

(m)    *With respect to Evercore's Contribution Analysis of PVR Partners and Regency, the separate specific contribution percentages for PVR Partners and Regency, and the implied exchange ratios, for each of the Case 1 and Case 2 Projections, for each of the following metrics: (i) 2014E EBITDA; (ii) 2015E EBITDA; (iii) 2016E EBITDA; and (iv) distributable cash flow.* The S-4 states on pages 80 to 81 that Evercore performed a contribution analysis of the proposed combined company to determine an implied exchange ratio under the Case 1 and the Case 2 Projections. However, the S-4 fails to provide the inputs listed above. These omissions render the S-4 materially misleading because they have a significant impact on the outcome of the Contribution Analysis. Unitholders are entitled to know these inputs so that they can determine if they are appropriate, and if not, select their own to arrive at a value of the appropriate exchange ratio. Without disclosure of these inputs into Evercore's Contribution Analysis, unitholders cannot determine if the outcome of Evercore's Contribution Analysis is an adequate measure of the proposed exchange ratio, and thus do not have the information necessary to make a competent decision as to whether to vote in favor of the Proposed Acquisition.

(n)    *Citi's analyses of the Proposed Acquisition.* The S-4 states that PVR Partners retained Citi as its financial advisor, and that Citi was intimately involved in the negotiations and analyses leading to the Proposed Acquisition. However, the S-4 does not disclose any of Citi's analyses of the value of the Partnership, the value of the various proposals between PVR Partners and Regency, and/or any valuation of other strategic alternatives. When voting on the Proposed Acquisition, PVR Partners' unitholders are also entitled to know whether the consideration offered in a merger is fair.

## PVR PARTNERS, PVR GP AND THE INDIVIDUAL DEFENDANTS
## BREACHED CONTRACTUAL DUTIES UNDER THE LPA

71.     The Board did not form a conflicts committee and obtained Special Approval, as is contemplated under Section 7.9(a)(i) of the LPA for resolution of potential or actual conflicts of interest.

72.     Despite existing conflicts, the Board should have constituted a conflicts committee to oversee and handle these negotiations or otherwise taken steps to ensure that unitholders' interests were being protected during negotiations between PVR Partners and Regency.

73.     Instead, the Board agreed to the Proposed Acquisition without resolving existing conflicts, and, therefore, violated the LPA.

74.     The Board's approval of the Proposed Acquisition was also a breach of the implied covenant of good faith and fair dealing.

75.     The Board cannot rely on the conclusive presumption described in Section 7.10(b) of the LPA. While Section 7.10(b) provides a conclusive presumption of good faith if PVR GP (and, thereby, the Board) relies on the opinion of a financial advisor, PVR GP must "reasonably believe[]" that such opinion is "within such Person's professional or expert competence."

76.     PVR GP could not, for example, have reasonably believed in good faith that Evercore was competent to issue the Evercore Fairness Opinion because Evercore served as Regency GP's financial advisor eight months earlier and had a pre-existing investment banking relationship with Regency.

77.     Section 7.10(b)'s conclusive presumption is inapplicable for purposes of the Proposed Acquisition. Any attempt by the Board to rely on Section 7.10(b)'s conclusive presumption is, in and of itself, a violation of the implied covenant of good faith and fair dealing.

78.     As a result of the foregoing, the Board breached the LPA and violated the implied covenant of good faith and fair dealing by entering into the Merger Agreement.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of PVR Partners common units who are being and will be harmed by defendants' actions described herein (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

80.     This action is properly maintainable as a class action.

81.     The Class is so numerous that joinder of all members is impracticable. According to the S-4, 210,714,852 PVR Partners common units are outstanding. These units are held by hundreds, if not thousands, of beneficial holders.

82.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(b)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(c)     whether the S-4 contains material misrepresentations and/or omissions in violation of federal laws;

(d)      whether the Individual Defendants have breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, candor and fair dealing;

(e)      whether defendants have breached the LPA by entering into the Merger Agreement;

(f)      whether defendants have violated the implied covenant of good faith and fair dealing by entering into the Merger Agreement;

(g)      whether defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives, including other offers for the Partnership or its assets;

(h)      whether the Proposed Acquisition compensation payable to Plaintiff and the Class is unfair and inadequate; and

(i)      whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

83.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

84.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

85.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

86.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

87.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Against the Individual Defendants, PVR Partners and PVR GP for Violations of §14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

88.     Plaintiff repeats and realleges each allegation set forth herein.

89.     During the relevant period, the Individual Defendants and PVR Partners disseminated the false and misleading S-4 specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     The S-4 was prepared, reviewed and/or disseminated by the Individual Defendants and PVR Partners. It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Partnership, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Partnership's assets.

91.     In so doing, the Individual Defendants and PVR Partners made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Partnership, the Individual Defendants and PVR Partners were aware of this information and of their duty to disclose this information in the S-4.

92.     The Individual Defendants and PVR Partners were at least negligent in filing the S-4 with these materially false and misleading statements.

93.     The omissions and false and misleading statements in the S-4 are material in that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Acquisition.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the S-4 and in other information reasonably available to unitholders.

94.     By reason of the foregoing, the Individual Defendants and PVR Partners have violated §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

95.     Because of the false and misleading statements in the S-4, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants, PVR Partners and PVR GP for Violation of §20(a) of the 1934 Act

96.     Plaintiff repeats and realleges each allegation set forth herein.

97.     The Individual Defendants acted as controlling persons of PVR Partners within the meaning of §20(a) of the 1934 Act as alleged herein.   By virtue of their positions as officers and/or directors of PVR Partners and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Partnership, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

98.     Each of the Individual Defendants and PVR Partners was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition, and they were thus directly involved in the making of this document.

100.    PVR Partners also had direct supervisory control over composition of the S-4 and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the S-4.

101.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants and PVR Partners were each involved in negotiating, reviewing and approving the Proposed Acquisition.  The S-4 purports to describe the various issues and information that these defendants reviewed and considered, descriptions which had input from both the Individual Defendants and PVR Partners.

102.    By virtue of the foregoing, the Individual Defendants and PVR Partners have violated §20(a) of the 1934 Act.

103.    As set forth above, the Individual Defendants and PVR Partners had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling

persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, PVR Partners' unitholders will be irreparably harmed.

## COUNT III

### Breach of Fiduciary Duties – Disclosure –
### Against the Individual Defendants

104.    Plaintiff repeats and realleges each allegation set forth herein.

105.    During the relevant period, the Individual Defendants and PVR Partners disseminated the false and misleading S-4 specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

106.    The S-4 was prepared, reviewed and/or disseminated by the Individual Defendants and PVR Partners.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Partnership, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Partnership's assets.

107.    In so doing, the Individual Defendants and PVR Partners made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Partnership, the Individual Defendants and PVR Partners were aware of this information and of their duty to disclose this information in the S-4.

108.    The Individual Defendants and PVR Partners were at least negligent in filing the S-4 with these materially false and misleading statements.

109.    The omissions and false and misleading statements in the S-4 are material in that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as

significantly altering the "total mix" of information made available in the S-4 and in other information reasonably available to unitholders.

110.    By reason of the foregoing, the Individual Defendants and PVR Partners have violated §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

111.    Because of the false and misleading statements in the S-4, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT IV

### Breach of Fiduciary Duties
### Against the Individual Defendants

112.    Plaintiff repeats and realleges each allegation set forth herein.

113.    The Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith and independence owed to the public unitholders of PVR Partners and have acted to put their personal interests ahead of the interests of PVR Partners' unitholders.

114.    By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly and recklessly and in bad faith are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in PVR Partners units.

115.    The Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties by entering into the Proposed Acquisition without regard to the fairness of the transaction to PVR Partners' unitholders.

116.    As set forth above, the Individual Defendants have breached their fiduciary duty by issuing materially misleading disclosures in the S-4 and by omitting material disclosures in the S-4.

117.    Because the Individual Defendants dominate and control the business and corporate affairs of PVR Partners, and are in possession of private corporate information concerning PVR Partners' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public unitholders of PVR Partners which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing unitholder value.

118.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have knowingly and recklessly and in bad faith failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

119.    As a result of the actions of defendants, Plaintiff and the Class have been and will be irreparably harmed.

120.    Unless the Proposed Acquisition is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to Plaintiff and the other members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition's terms, and will not supply to PVR Partners' unitholders sufficient information to enable them to make informed decisions regarding the tender of their units in connection with the Proposed Acquisition, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

121.    Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT V

**Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty
Against PVR Partners, PVR GP, Regency, RVP and Regency GP**

122.    Plaintiff repeats and realleges each allegation set forth herein.

123.    Defendants PVR Partners, PVR GP, Regency, RVP and Regency GP are sued herein as an aiders and abettors of the breaches of fiduciary duty outlined above by the Individual Defendants.

124.    The Individual Defendants breached their fiduciary duties of loyalty, care, candor and good faith and fair dealing to the PVR Partners unitholders.

125.    Such breaches of fiduciary duties could not and would not have occurred but for the conduct of defendants PVR Partners, PVR GP, Regency, RVP and Regency GP in aiding and abetting such breaches.

126.    Defendants PVR Partners, PVR GP, Regency, RVP and Regency GP had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to PVR Partners unitholders, and thus knowingly participated in such breaches.

127.    Defendants PVR Partners, PVR GP, Regency, RVP and Regency GP provided substantial assistance to the Individual Defendants in the breach of their fiduciary duties owed to PVR Partners unitholders.

128.    As a result of defendants PVR Partners, PVR GP, Regency, RVP and Regency GP's aiding and abetting the Individual Defendants' breaches of fiduciary duties, Plaintiff and the other members of the Class were damaged in that they were prevented from obtaining a fair price for their units.

129.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT VI

### Against the Individual Defendants, PVR Partners and PVR GP for Breach of Express and Implied Duties in Connection with the Proposed Acquisition

130.     Plaintiff repeats and realleges each allegation set forth herein.

131.     PVR GP and the Individual Defendants owed PVR Partners and its public limited partners duties as defined in the LPA.  Further, PVR GP and the Individual Defendants owed PVR Partners' public limited partners the implied duty of good faith and fair dealing, which the LPA could not eliminate.

132.     PVR GP and the Individual Defendants breached their express obligations under the LPA and the implied duty of good faith and fair dealing by, for example, causing PVR Partners to enter into the Merger Agreement and pursue the Proposed Acquisition, and by failing to avail themselves of the Special Approval mechanism for resolving conflicts of interest as detailed in the LPA.

133.     By reason of the foregoing, PVR GP and the Individual Defendants approved the Proposed Acquisition in bad faith.

134.     Plaintiff and the other members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT VII

### Against the Individual Defendants and PVR Partners for Aiding and Abetting PVR GP's Breach of Express and Implied Duties in Connection with the Proposed Acquisition

135.     Plaintiff repeats and realleges each allegation set forth herein.

136.    As set forth above, PVR GP owed PVR Partners' limited unitholders duties and obligations that PVR GP breached in respect to the Proposed Acquisition.

137.    Further, each of the other defendants knowingly participated in the foregoing breaches by directly or indirectly causing PVR GP to pursue the Proposed Acquisition and enter into the Merger Agreement, thereby causing damage to Plaintiff and the Class.

138.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in Plaintiff's favor and in favor of the Class and against defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action;

B.    Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Partnership adopts and implements a procedure or process to obtain the highest possible value for unitholders;

C.    Directing defendants to fairly and fully disclose all material information concerning the Proposed Acquisition;

D.    Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of PVR Partners' unitholders and to refrain from entering into any transaction until the process for the sale or merger of the Partnership is completed and the highest possible value is obtained;

E.    Directing that defendants have aided and abetted, or breached their fiduciary duties, violated the LPA and/or breached the implied covenant of good faith and fair dealing owed to Plaintiff and the other members of the Class;

F.      Directing that defendants account to Plaintiff and the other members of the Class for

all damages caused by them as a result of their express breaches of the LPA and/or violations of the

implied covenant of good faith and fair dealing;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and experts' fees; and

H.      Granting such other and further equitable relief as this Court may deem just and

proper.

DATED:  December 12, 2013          LAW OFFICES OF BERNARD M. GROSS, P.C.
                                   DEBORAH R. GROSS

                                   _____
                                            DEBORAH R. GROSS

                                   Suite 450, John Wanamaker Building
                                   100 Penn Square East
                                   Philadelphia, PA 19107
                                   Telephone:  215/561-3600
                                   215/561-3000 (fax)

                                   ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                   SAMUEL H. RUDMAN
                                   MARK S. REICH
                                   MICHAEL G. CAPECI
                                   58 South Service Road, Suite 200
                                   Melville, NY 11747
                                   Telephone:  631/367-7100
                                   631/367-1173 (fax)

                                   ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                   DAVID T. WISSBROECKER
                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101-8498
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

                                   *Attorneys for Plaintiff*

- 43 -

## PLAINTIFF'S CERTIFICATION

I, Mr. William Engel, ("Plaintiff") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in PVR Partners of securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|-----------------------|------------------|-------|
| 9/23/2004 | 2000 | 0 | 19. 80 |

5.      Plaintiff has served as a class representative in the action listed as follows:

*Engel, et al. v. CapitalSource Inc., et al.*; Cause No. BC – 516267; Pending in the Superior Court of the State of California, County of Los Angeles

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of December, 2013.

William Engel
386 Holland Hill Rd.
Putney, Vermont 05346
Windham County